IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| MARGAE, INC.,<br><br>　　　　　　　　Plaintiff,<br><br><br>　　　　vs.<br><br><br>CLEAR LINK TECHNOLOGIES, LLC, et al.,<br><br>　　　　　　　Defendants. | ORDER and MEMORANDUM OPINION<br><br><br><br>Case No. 2:07-CV-916 TC |

This matter comes before the court on the Motion of Defendants Clear Link Technologies LLC, James Clarke, Alan S. Earl, Phil Hansen, Bruce Westenkow, and Ben Henderson (collectively, "Clear Link") to Enforce Contract. (Dkt. No. 32.) In its motion, Clear Link seeks a finding that Plaintiff Margae, Inc. ("Margae") agreed by written contract to arbitrate all of its claims against Clear Link. Clear Link requests an order compelling arbitration of those claims. For its part, Margae admits that it agreed to the written contract on which Clear Link relies, but denies that the contract applies to all of Margae's claims. Margae argues that in any event, the court should not compel the arbitration of any of its claims based on the written contract because that contract is unenforceable.

After carefully reviewing the parties' legal and factual submissions, the court concludes that Margae agreed to arbitrate only some of its claims and that Margae's agreement to do so is enforceable. Based on this finding, the court is inclined to grant in part and deny in part Clear Link's motion to enforce. The court recognizes, however, that it may be inefficient to divide

Margae's claims between federal court and arbitration.  Therefore, the parties are instructed to confer and attempt to agree on how to proceed in light of the court's findings.  If the parties cannot agree, the court will compel arbitration of only those claims covered by the written agreement.

## BACKGROUND

Margae is an internet marketing company that performs what it describes as two separate types of work.  One type is "affiliate marketing," where Margae generates sales leads for other companies through Margae's own websites.  The other is "search engine optimization" ("SEO").  When Margae performs SEO services, Margae "builds, manages, and updates the merchant's websites so as to achieve the highest ranking possible on various internet search engines."  (Margae's Mem. in Opp'n at 3.)  According to Margae, when performing SEO services, it "uses its own confidential and proprietary material and techniques in working on the [client's] website."  (Id.)[1]  Margae is paid on a commission basis for both affiliate marketing and SEO work, taking a percentage of the revenues made from the sales leads generated.  Mark Goodman, Margae's principal representative, stated that being paid on a commission basis for SEO services is not common in the industry.

Like Margae, Clear Link is an internet marketing company.  Clear Link is also an authorized dealer for products and services provided by companies including DIRECTV, DISH Network, ADT, and HughesNet.  One of the websites owned by Clear Link is USDirect.com, where Clear Link conducts marketing for DIRECTV.  In addition to marketing on its own websites, Clear Link works with other internet marketing companies to generate sales leads for

---

[1]Margae apparently uses the same techniques for SEO and affiliate marketing services. The key difference is that Margae performs SEO services on its clients' websites and affiliate marketing services on its own websites.

Clear Link's clients.  As a general matter, Clear Link pays these other companies a percentage of the completed sales made from sales leads that the other companies generate on their own websites.  Alan Earl is Clear Link's principal representative in managing Clear Link's marketing relationships.

In early May 2006, Mr. Goodman contacted Mr. Earl about Margae providing SEO and affiliate marketing services to Clear Link.  (Margae had also provided marketing services to one of Clear Link's predecessor companies.)  The parties' present dispute centers on exactly what Mr. Goodman and Mr. Earl agreed at that time.  Margae maintains that it entered into an oral agreement covering SEO services that Margae would provide to Clear Link on USDirect.com and other Clear Link websites.  According to Margae, it also entered into a written agreement covering affiliate marketing services that Margae would provide to the USDirect.com website. Clear Link's position is that the parties entered into a written agreement covering all of the services that Margae would provide to Clear Link.

Mr. Goodman stated that at some point in early May 2006, he reached an oral agreement with Mr. Earl that Margae would provide SEO services to USDirect.com.  Mr. Goodman says that he and Mr. Earl agreed that Margae would expand and modify USDirect.com using Margae's proprietary methods to maximize sales leads and in return Margae would get a commission on sales generated from those leads.  (See Goodman Decl. ¶ 22.)  Mr. Goodman further asserted that Clear Link agreed not to use at least one proprietary website enhancement technique on some of Clear Link's other controlled websites.  (See id.)

Mr. Goodman acknowledges that on May 4, 2006, he went to the USDirect.com website and clicked on a link stating "I accept these terms" that was linked to an agreement titled "Sales Partner Terms of Agreement" (the "Partner Agreement").  Mr. Goodman further admits that the

3

Partner Agreement covers the affiliate marketing work Margae would do for Clear Link, at least for the work on USDirect.com.  But Mr. Goodman denies that he intended that the Partner Agreement cover the SEO portion of the work Margae was to do for Clear Link.  (See Goodman Decl. ¶ 21.)

Mr. Earl does not dispute Mr. Goodman's description of the oral agreement regarding the SEO work.  Instead, Mr. Earl maintains that at the end of the negotiations, he told Mr. Goodman that Mr. Goodman should sign the Partner Agreement.  According to Mr. Earl, it was his intent that the Partner Agreement would cover both the SEO and affiliate marketing services that Margae would provide to Clear Link.  Mr. Earl further asserts that his discussion with Mr. Goodman included an understanding that Margae would provide services to Clear Link-related companies other than USDirect.com, including ADT.

The parties do not dispute what the Partner Agreement states on its face.  The parties to the Partner Agreement are named as "USDirect.com, a Clear Link Technologies Company" and "Sales Partners."  Of importance here are the Partner Agreement's modification and venue clauses.  The modification clause states that USDirect.com may modify the agreement at any time by notifying the Sales Partner or by posting a new agreement on USDirect.com.  (See Partner Agreement ¶ 2, attached as Ex. A to Def's Mem. in Support.)  If the Sales Partner continues to provide services, according to the clause, the Sales Partner is deemed to have accepted the modification.  (See id.)  The venue clause selects Utah as the site of any litigation.

In June 2006, Clear Link posted a new agreement on USDirect.com (the "Amended Agreement").  The Amended Agreement was between "Clear Link Technologies, LLC, through its subsidiaries" and "IR Agents."  "IR Agents" are the equivalent of the Partner Agreement's Sales Partners.  The Amended Agreement was different in many ways from the Partner

4

Agreement, but the only change of significance to this motion is that the Amended Agreement contains an arbitration clause, while the Partner Agreement does not.

Margae and Clear Link had a continuous and apparently successful relationship between May 2006 and March 2007, with Clear Link paying Margae commissions for all of Margae's work.  At some point after May 2006, Margae's SEO and affiliate marketing services for Clear Link expanded from USDirect.com to include Clear Link websites such as ADT, DISH Network, and Comcast.

According to Mr. Goodman, at the end of March 2007, Margae and Clear Link had a disagreement about work Margae performed on a Clear Link website.  (See Goodman Decl. ¶ 39.)  Mr. Goodman asserts that without notice, Clear Link locked Marge out of the Clear Link websites where Margae had been performing SEO work.  (See id.)  Thereafter, Mr. Goodman maintains, Clear Link refused to pay commissions on sales generated from Margae's efforts, continued to use proprietary information and improvements that Margae had provided, and refused to remove pages created by Margae from Clear Link-owned websites.  (See id. ¶¶ 40-42.)

On June 18, 2007, Margae filed suit against Clear Link in North Carolina state court.  In its complaint, Margae alleged that "Margae [] had a contract with [Clear Link] to generate internet traffic and sales for [Clear Link's] clients, including: ADT, DIRECTV, DISH Network, and HughesNet." (Compl. at ¶ 14.)  Margae further alleged that Clear Link had violated various asserted contractual duties and that Clear Link was using Margae's proprietary materials without compensation or acknowledgment.  (See, e.g., id. at ¶¶ 20-22, 24, 27.)  Margae asserted six claims, including breach of contract and unjust enrichment.  Margae sought relief including compensatory and punitive damages, an accounting of profits from Clear Link's alleged misuse of Margae's proprietary information and attorneys fees.

5

In July 2007, Clear Link removed Margae's state court action to the District Court for the Western District of North Carolina based on diversity jurisdiction.  After removal, Clear Link sought to dismiss the claims against the individual defendants and to compel arbitration of Margae's claims against Clear Link or, in the alternative, to transfer venue of the entire action to Utah.  Clear Link based its motion to transfer to Utah primarily on the Partner Agreement's venue clause.  Clear Link's motion to compel arbitration was grounded on the Amended Agreement's arbitration provision.  In opposing these motions, Margae denied agreeing to either the Partner Agreement or the Amended Agreement.

The magistrate judge for the Western District of North Carolina concluded that Margae had agreed to the Partner Agreement.  Specifically, the magistrate found that Mr. Goodman had clicked on the "I accept these terms" link that was connected to the Partner Agreement, and that the USDirect.com website was working properly when he did so.  (Mem. and Recommendation at 7, Dkt. No. 45 of W.D.N.C. Case. No. 1:07cv251.)  The magistrate judge, however, did not address the issue of whether the Partner Agreement governed the entire relationship between Margae and Clear Link.

Nor did the magistrate judge reach the question of whether Margae could be compelled to arbitrate under the Amended Agreement's arbitration clause.  Instead, the magistrate recommended that the case be transferred to Utah based on the Partner Agreement's venue clause.  After the parties did not object to the magistrate's recommendations, the district court judge for the Western District of North Carolina transferred this action to Utah.

Once this action was transferred to this court, Margae changed positions and itself moved to compel arbitration of all of its claims.  Margae did not invoke the Amended Agreement's arbitration clause in support of that motion.  Instead, Margae maintained that Clear Link had

agreed to arbitrate by seeking to compel arbitration in North Carolina. Clear Link responded that it did not oppose arbitration generally, but argued that arbitration should be compelled pursuant to the Amended Agreement. Clear Link stated that it preferred to litigate all of Margae's claims in federal court if the order compelling arbitration was not based on the Amended Agreement.

At the hearing on Margae's motion to compel arbitration, the court determined that it needed an evidentiary hearing on whether the parties had agreed to arbitrate in May 2006. Accordingly, a hearing was set for May 23, 2008. Before that hearing, however, the parties submitted affidavits from Mr. Goodman and Mr. Earl explaining the factual predicate behind the parties' legal positions. Clear Link also made the present motion to enforce the Amended Agreement's arbitration clause, which Margae opposed. At the May 23 hearing, the parties agreed that the affidavits were sufficient to allow the court to decide this motion.

## ANALYSIS

As explained below, the court finds that Margae and Clear Link had a verbal agreement covering the SEO services that Margae provided to Clear Link. This verbal agreement also governed Clear Link's use of Margae's proprietary information. There is no indication from the record that the parties agreed to arbitrate claims arising from those services and information. Accordingly, the court will not compel arbitration of any claim relating to SEO work that Margae performed for Clear Link, or for claims related to Clear Link's alleged misappropriation of Margae's proprietary information.

On the other hand, Margae acknowledges that it agreed that the Partner Agreement would cover its affiliate marketing services. From the context of the relationship, the court has concluded that the Partner Agreement applies to all of the affiliate marketing work Margae performed for any Clear Link account. The court further finds that the Amended Agreement

7

altered the Partner Agreement and that the Amended Agreement contains an enforceable

arbitration clause.  Consequently, Margae can be compelled to arbitrate its claims related to all of

the affiliate marketing services it performed for Clear Link.

**I.**    **Arbitrability of Margae's Claims Relating to SEO Services**

      The record does not support a finding that Margae intended for the Partner Agreement to

cover the SEO services that Margae would provide to Clear Link.  Rather, the court concludes

that the parties intended that the oral agreement Mr. Goodman described would govern those

services.

      Looking at the terms of the Partner Agreement, it does not appear to be drafted to govern

SEO services.  The Partner Agreement is silent on various issues that would be crucial to

Margae, which planned to place its valuable proprietary information on a potential competitor's

website.  For example, there is nothing in the agreement that covers Clear Link's use of Margae's

proprietary information.  Likewise, the Partner Agreement lacks terms that would be important to

Clear Link, which was granting extensive access to its websites to a potential competitor.  For

example, there is nothing in the agreement describing the parameters of the work that Margae

could perform on Clear Link's websites.  (It is not surprising that the Partner Agreement does not

cover this issues, since it is fairly clear that it is a form agreement designed to govern Clear

Link's relationship with any internet marketing company willing to provide affiliate marketing

services to Clear Link.)

      In contrast, the verbal contract covering SEO services described by Mr. Goodman

addresses the key components of Margae's SEO work.  These issues include the payment

structure, the extent of the work Margae would provide on Clear Link's websites, and limitations

on Clear Link's permission to use Margae's proprietary information.  There is no indication that

the parties agreed to arbitrate claims arising from the SEO services performed under this verbal agreement.

Clear Link's arguments supporting its contention that the Partner Agreement applies to Margae's SEO services are unavailing.  First, Clear Link argues that Mr. Earl intended that the Partner Agreement should cover the SEO work.  But Clear Link does not point to any evidence that Mr. Goodman understood this to be Mr. Earl's intent.  And Mr. Earl did not dispute Mr. Goodman's summary of the verbal agreement that Mr. Goodman states they reached.

Moreover, Clear Link makes much of the integration clause in the Amended Agreement to argue that the parties agreed that both affiliate marketing and SEO services would be covered by written agreement.  In doing so, Clear Link skipped the threshold question, which is whether the Partner Agreement applied to SEO services.  The Amended Agreement's integration clause has no bearing on that question.

The court finds that the oral agreement regarding Margae's SEO work on USDirect.com also applies to the SEO work Margae performed on other Clear Link websites.  Since the nature of the work Margae performed on these websites was the same as its work on USDirect.com, it is a logical conclusion that the same agreement would apply.  In addition, it was in the context of SEO work that Margae placed proprietary information on Clear Link's websites.  As such, the court finds that Margae did not agree to arbitrate its claims related to its proprietary information.

In sum, the court finds that the SEO work Margae performed for Clear Link was governed by a oral agreement.  The court does not need to determine the exact terms of that agreement, as the only question relevant here is whether the parties consented to arbitrate.  They did not.  Accordingly, the court will not compel the arbitration of Margae's SEO work- related claims.

II.      **Arbitrability of Margae's Claims Related to Affiliate Marketing Services**

Margae concedes that the Partner Agreement covered the affiliate marketing services it provided to Clear Link.  Margae contends, however, that there are several reasons why the Amended Agreement's arbitration clause cannot be enforced to compel it to arbitrate its claims relating to affiliate marketing services.  Margae's arguments do not prevail and the court concludes that Margae may be compelled to arbitrate those claims.

Margae asserts three grounds supporting is argument that the Amended Agreement's arbitration clause should not be enforced: (1) that it did not agree to the Amended Agreement; (2) that there was a lack of consideration for the Amended Agreement; and (3) that the Partner Agreement's modification clause and the entire Amended Agreement are unconscionable.  These arguments will be addressed in turn.

First, Margae contends that it did not assent to or receive notice of the Amended Agreement.  But Margae agreed in advance that it would be bound by modifications effective when Clear Link posted a new agreement on USDirect.com.  (See Partner Agreement ¶ 2, attached as Ex. A to Defs' Mem. in Support.)  Margae further understood that if it did not agree to any modification, it could terminate the contract.  (See id.)  Moreover, Margae did not agree that actual notice of changes to the contract was required, so it should have monitored to determine whether any amendments had been posted.  See MySpace, Inc. v. The Globe.com, Inc., Case No. CV 06-3391-RGK (JCx), 2007 WL 1686966, *10 (C.D. Cal. Feb. 27, 2007) (holding that party that had agreed to a similar modification clause "should have known" about terms of the modified contract that the other party had posted on its website).

Moreover, there was consideration for the Amended Agreement.  Simply put, Margae continued to provide affiliate marketing services to Clear Link, and Clear Link continued to pay

commissions to Margae.  See Johnson v. Thiokol, Inc., 818 P.2d 997, 1002 (Utah 1991)

(employee accepted modified contract by continuing to work after modification).  Margae seems

to assert that the consideration given for a contract modification has to be different or greater

than the consideration given for the original contract, but cites no authority to substantiate that

assertion.

Finally, Margae's argument that the agreements are unconscionable fails.  As a general

matter, Utah "law . . . permits parties to enter into unreasonable contracts or contracts leading to

a hardship on one party."  See Ryan v. Dan's Food Stores, Inc., 972 P.2d 395, 402 (Utah 1998)

To meet the "heavy burden" of showing that a contract is unconscionable, a party must prove

both procedural and substantive unconscionability.  Id.  The procedural prong analyzes the

contract formation while the substantive prong focuses on the contents of the agreement.  See id.

Margae has not met its burden of showing that either the Partner Agreement or the Amended

Agreement are unconscionable.

There was no procedural unconscionability in the formation of either agreement.

Importantly, Margae is a sophisticated corporation that had operated under a written contract

with a predecessor of Clear Link.  There is no factual basis to support Margae's assertion that it

was in an inferior bargaining position as compared to Clear Link.  Moreover, nothing about the

contract negotiations leading to the Partner Agreement amounted to overreaching or oppression

by Clear Link.  While using a "boilerplate" agreement may be a factor in the analysis, it is not

determinative.  See, e.g., id. at 402-04 (not procedurally unconscionable for pharmacy to enter an

at-will employment contract by providing pharmacist with a "boilerplate" employment manual).

Nor does amending the Partner Agreement under its own terms strike the court as procedurally

improper.

11

Further, neither agreement is substantively unconscionable.  Here, the court is only concerned with the Partner Agreement's modification clause and the Amended Agreement's arbitration clause, because those are the only terms that Clear Link seeks to enforce in its motion. Accordingly, it is not necessary to address Margae's arguments about other clauses in the Amended Agreement at this time.

Looking to the Partner Agreement's modification clause, Margae asserts that it was unfair for Clear Link to grant itself the unilateral right to modify the contract by posting a new one on its website.  But this argument fails for a several reasons.   First, Margae had reason to continually visit the website that contained a link to the Amended Agreement, and Margae easily could have checked for updates to the Partner Agreement at any time.  Moreover, Margae was a sophisticated corporation being paid for its services on a monthly basis.  In that context, monitoring for updates is not unduly burdensome.  Margae cites several cases holding that similar internet modification provisions were unconscionable.  Those cases, however, are distinguishable because they involved a corporation unilaterally changing its relationship with consumers via changes to a website.  Here, the court is faced with internet-savvy corporate parties that entered a contract on the internet and agreed to make changes through the internet.

Turning to the Amended Agreement's arbitration clause, Margae contends that it unfairly grants Clear Link the right to pursue equitable remedies in court with no corresponding right to Margae.  This aspect of the clause does not strike the court as unfair.  Margae is not prohibited from seeking equitable remedies altogether, but instead must seek them in arbitration only.  In any event, even if the arbitration clause were unfair, courts have the power to construe agreements to avoid inequities.  See, e.g., Ryan, 972 P.2d at 402.  The arbitration clause is enforceable.

12

Consistent with the court's holding that the verbal agreement governs all of Margae's SEO work, the court finds Amended Agreement's arbitration clause applies to all of Margae's affiliate marketing services.  Mr. Earl states that in May 2006, he and Mr. Goodman discussed work to Marge would undertake for Clear Link websites and clients other than USDirect.com and DIRECTV, such as ADT.  These discussions show that Mr. Goodman understood that any affiliate marketing services Margae provided to Clear Link would be governed by the same agreement.

For the foregoing reasons, the court finds that Margae agreed to arbitrate any claim relating to the affiliate marketing services it provided to Clear Link.

## ORDER

Within thirty days of the date of this Order, the parties will inform the court how they plan to proceed in light of the court's findings and conclusions herein.

SO ORDERED this day of 16th day of June, 2008.

BY THE COURT:

TENA CAMPBELL
Chief District Judge